970 So.2d 403 (2007)
BRADENTON GROUP, INC., et al., Appellants/Cross-Appellees,
v.
STATE of Florida, Appellees/Cross-Appellants.
Nos. 5D05-3338 to 5D05-3341.
District Court of Appeal of Florida, Fifth District.
November 9, 2007.
*405 Thomas F. Egan of Thomas F. Egan, P.A., Orlando, for Appellant/Cross-Appellee, Philip Furtney.
Steven G. Mason of Steven G. Mason, P.A., Orlando, for Appellants/Cross-Appellees, Bradenton Group, Inc., Eight Hundred, Inc., and Pondella Hall For Hire, Inc.
Bill McCollum, Attorney General, and J. Andrew Atkinson and Erik M. Figlio, Deputy Solicitors General, Tallahassee, for Appellees/Cross-Appellants.
THOMPSON, J.
Pondella Hall for Hire, Inc. ("Pondella"), Eight Hundred, Inc. ("Eight Hundred"), Bradenton Group, Inc. ("Bradenton"), and Philip Furtney ("Furtney") raise 13 issues on appeal arising from an amended final judgment that brought to a close a civil RICO forfeiture action initiated in November 1995.[1] This is the case that resulted in our decision in Bradenton Group, Inc. v. Department of Legal Affairs, 701 So.2d 1170 (Fla. 5th DCA 1997) ("Bradenton I"), and the Florida Supreme Court's decision in Department of Legal Affairs v. Bradenton Group, Inc., 727 So.2d 199 (Fla.1998) ("Bradenton II"). Though we are surprised to see this case again, we reverse the trial court below. In light of our holding, the State's cross-appeal is moot.[2]
Background
In its November 1995 amended complaint, the State sought forfeiture of various real property and proceeds resulting from the defendants' bingo operations, which violated various provisions of section 849.0931, Florida Statutes (1991) (the "Bingo Statute"). It alleged the "Pondella Enterprise" began around 1 January 1991 and continued through 24 October 1995. According to the State, the predicate acts under RICO  bingo  constituted a pattern of racketeering activity under section 895.02(3), Florida Statutes (1991), and were illegal lotteries giving rise to RICO liability.
The court entered a temporary injunction prohibiting the defendants from conducting bingo games, but did not require the State to post a bond. Later, the court granted the defendants' motion to require a $1.4 million bond, which ultimately led to the appeal decided by this court's decision in Bradenton I, which the supreme court approved in part and quashed in part in Bradenton II. The Florida Supreme Court held that a bingo game conducted by an organization not authorized under section 849.0931, or conducted by an authorized organization in violation of various provisions *406 of section 849.0931, did not constitute a "lottery" under section 849.09 and was not racketeering subject to RICO liability. Bradenton II, 727 So.2d at 199. The supreme court explicitly disagreed with the State's argument that the defendants were unauthorized organizations whose violations of the Bingo Statute constituted illegal lotteries subject to punishment and forfeiture under the lottery and RICO statutes. Id. at 201. The court noted that the lottery statute expressly stated it did not apply to bingo. Id. at 202 (citing section 849.09(3), Fla. Stat. (1991)). Furthermore, the RICO statute listed the provisions of the gambling chapter that it punished, which did not include the Bingo Statute. Id. (citing section 895.02(1)(a)(32), Fla. Stat. (1991)). The Florida Supreme Court closed its discussion of the relationship between the Bingo Statute and the RICO statutes, as follows:
Without a clearer signal from the legislature, we are unwilling to create such a distinction and transform routine bingo offenses into lottery and RICO violations. Accordingly, we answer the certified question in the negative and hold that under the present statutory scheme violations of the bingo statute are not punishable under the lottery or RICO statutes.

Id. (emphasis added).
However, the supreme court approved this court's decision to require a bond, stating:
[T]he very broad injunction the state requested  and received  will severely damage the defendants if its entry was improper. . . . As the state thrives under the broad grant of authority to the circuit court in subsection (5), so must it suffer under it.
Id. (quoting Bradenton I, 701 So.2d at 1180) (footnote omitted). When the supreme court denied the State's motion for rehearing, it granted the defendants' motion for award of attorney's fees pursuant to section 60.07, Florida Statutes (1995).
The case was thereafter remanded to the trial court. In response to Bradenton II, the defendants filed motions to dismiss and for summary judgment. The State responded by filing a second amended complaint in July 1999. That complaint changed the dates of the predicate acts, alleged additional predicate acts, and added additional defendants to various charged predicate acts. In addition to alleging additional predicate acts, the "facts common to all counts" portion of the complaint changed the enterprise's start date to 1 June 1990. As to its allegations that members of the enterprise had "conducted bingo games," the State now contended that the members "conducted lotteries and gambling games." These "lotteries and gambling games" allegedly violated 18 U.S.C. § 1955, which prohibited illegal gambling businesses. Again, the State sought injunctions and forfeiture of property and proceeds under the RICO statute.
The State argued that nothing in Bradenton II overturned cases holding that illegal bingo operations could be deemed "keeping a gambling house," violating section 849.01. Furthermore, it claimed lottery violations other than bingo occurred. The court denied summary judgment in August 2003, accepting the State's argument that section 895.02(1)(b) defined racketeering activity as any conduct defined by 18 U.S.C. § 1961(1) as racketeering activity  and § 1961(1) included any act under 18 U.S.C. § 1955, which prohibited an illegal gambling business.
In September 2003, the defendants requested that the court take judicial notice of Lamar v. Pondella Hall for Hire, Inc., 8 Fla. L. Weekly Supp. 830 (Fla. 9th Cir. Oct. 1, 2001). In Lamar, the State Attorney in the Ninth Judicial Circuit filed an *407 August 1994 complaint seeking RICO forfeiture against Furtney and Pondella for their bingo violations in Orange and Osceola Counties.[3] In July 2001, the State moved to consolidate that case with the underlying case, arguing the case below "include[d] and subsume[d] the subject matter" of Lamar and was based on the same bingo operations. The Lamar court denied the motion and granted summary judgment for Pondella and Furtney in the State's forfeiture action based upon the bingo operation in Orange County. It held that Bradenton II controlled, and further held:
2. That the alleged conduct of bingo games and the alleged violations of any regulations dealing with the conduct of those games, including those specifically set out in Section 849.0931, Fla. Stat., do not and cannot form the basis of a racketeering violation or any violation of Section 895.01, et seq., or violations of any of the other gambling laws in Chapter 849. Section 849.0931 pre-empts and supersedes the filing of criminal charges under any other provision of Chapter 849, Fla. Stat.
3. That the bingo equipment and property seized by the Plaintiff are therefore not subject to forfeiture under Chapter 849 or under Chapter 895, Fla. Stat.
8 Fla. L. Weekly Supp. at 831.
The court below judicially noticed Lamar, but denied summary judgment because it believed res judicata did not apply. Lamar dealt with bingo, during a certain date range, in Orange and Osceola Counties; in contrast, the case below dealt with "lotteries," during a somewhat expanded date range, throughout Florida.
In June 2004, the court granted the State's second motion to amend its second amended complaint. The order was accompanied by a list of 13 amended predicate acts that were supposed to replace numbers 1-13 of the second amended complaint. In May 2004, defendants moved for damages resulting from the injunction under section 60.07. Finally, the court acknowledged that, if it granted the defendants' motion in limine to exclude any evidence or allegation that section 849.0931 was violated by them, it "would gut [the State's] entire case."
The two-week trial took place in February 2005. The State's focus, from its opening statement, was almost entirely on the Bingo Statute: "[T]he Florida Statute [it] alleged these defendants violated [was] the Florida Bingo statute or the Florida Lottery Statute." The primary violations throughout the trial were that the bingo operators were not bona fide members of the charities, and that the defendants were responsible for illegally stuffing the tip jars with pay.[4] The State's closing argument emphasized that the "case [came] down to two things": whether the workers were paid and whether they were bona fide members of the charities. For racketeering, *408 all the jury had to do was find a violation of the Bingo Statute. The State reiterated that: "Bingo is gambling. That's just it. That such gambling business violated the laws of the State of Florida."
The jury was instructed on the Bingo Statute and found the defendants had engaged in racketeering activity.
After Trial
A flurry of motions followed. The defendants moved for directed verdict, set aside, new trial, remittitur, and damages resulting from the temporary injunction. The State moved for a permanent injunction ordering the defendants to divest themselves of any interests concerning bingo, refrain from any conduct or operations involving bingo or lotteries, and forfeit any licenses, permits, or approvals obtained or used for the purpose of operating bingo halls or conducting bingo games or lotteries.
The amended final judgment, order on post-trial motions, and a consolidated order on the injunctions and damages held that the defendants had engaged in racketeering activity, were not entitled to damages under the injunction, and forfeited their interest in property in which they had an interest when the action was filed. The court remitted the damages amount to $10,000. As to damages for the injunction, though the court ruled that the defendants were not entitled to damages, it heard evidence of the damages through testimony by Furtney and an expert witness's testimony and documentation. The court held it was not making a finding on the reasonableness of damages, and acknowledged the State's claim that, if the judgment was reversed, the State would argue about the amount of damages claimed. The parties and court believed they would return to the damages issue if this court sent the case back.
The defendants raise 13 issues on appeal, and the State, on cross-appeal, argues that granting remittitur was error. We find three issues to be dispositive. Collateral estoppel barred the action below, violations of the Bingo Statute are not punishable under Florida RICO statutes, and the trial court should consider the defendants' entitlement to damages resulting from the State's injunction.
A. Collateral estoppel
Pondella claims that the action below was barred by the judgment in Lamar under the doctrines of res judicata, the prohibition against splitting causes of action, and collateral estoppel. The defendants raised this claim several times below in motions for summary judgment, which the trial court denied. The standard of review for orders on summary judgment is de novo. Major League Baseball v. Morsani, 790 So.2d 1071, 1074 (Fla.2001).
"[C]ollateral estoppel prevents identical parties from relitigating identical issues that have been determined in a prior litigation." Hicks v. Hoagland, 953 So.2d 695, 698 (Fla. 5th DCA 2007) (citing Burns v. DaimlerChrysler Corp., 914 So.2d 451, 453 (Fla. 4th DCA 2005)).
"Collateral estoppel is a judicial doctrine which in general terms prevents identical parties from relitigating the same issues that have already been decided." Under Florida law, collateral estoppel, or issue preclusion, applies when "the identical issue has been litigated between the same parties or their privies." In addition, the particular matter must be fully litigated and determined in a contest that results in a final decision of a court of competent jurisdiction.
City of Oldsmar v. State, 790 So.2d 1042, 1046 n. 4 (citations omitted). Thus, even if the causes of action are different, thus *409 barring res judicata, collateral estoppel bars the re-litigation of specific issues that were litigated and decided in the former suit. Zikofsky v. Mktg. 10, Inc., 904 So.2d 520, 525 (Fla. 4th DCA 2005).
Pondella notes that the State brought the Lamar case as a RICO forfeiture case on the basis of Pondella and Furtney's bingo operations. The complaint in Lamar alleged various violations of the Bingo Statute, which were repeated in the amended complaints in the action here. Furthermore, in the State's motion to consolidate in that case, the State argued the case below included and subsumed the matter in Lamar. Pondella and Furtney were awarded summary judgment on the basis that bingo violations cannot form the basis of a racketeering violation. The State did not appeal the summary judgment against it in Lamar.
Pondella argues that Eight Hundred and Bradenton may also invoke collateral estoppel because they were privies of Pondella and Furtney. See, e.g., Gwynn v. Daly Agency, Inc., 759 So.2d 20, 22 (Fla. 3d DCA 2000). The State does not dispute that Eight Hundred and Bradenton were privies of Pondella and Furtney, but responds that the defendants did not specify which issue they believed to be precluded. This argument is disingenuous. The Lamar court granted summary judgment based on Bradenton II's holding that the conduct of bingo games and violations of the Bingo Statute "do not and cannot form the basis of a racketeering violation or any violation of [the Florida RICO statutes]. . . ." As a result, the defendants' equipment and property was not subject to RICO forfeiture.
The State's second argument is that the court never decided the State's argument in this case, that bingo violations could give rise to the businesses being defined as "illegal gambling businesses" under federal law and swept into RICO under section 895.02(1)(b). This point is discussed further below, but as to collateral estoppel, the State misses the point. For collateral estoppel to apply, the Lamar judgment was not required to address every permutation of every argument by which the State could classify bingo offenses as RICO violations. The issues in Lamar and in the case below were identical: whether specific, enumerated violations of the Bingo Statute constituted predicate acts giving rise to RICO liability. The judgment in Lamar concluded that they could not. Thus, Lamar represented a final adjudication of the overriding, dispositive issue: whether bingo violations could form the predicate for RICO forfeiture. See Zimmerman v. Office of Ins. Regulation, 944 So.2d 1163, 1168 (Fla. 4th DCA 2006).
B. Whether violations of Bingo Statute are punishable under Florida RICO statute
The defendants argue that, under Bradenton II, bingo violations can never form the basis of a RICO claim. The State responds that Bradenton II bars RICO liability for routine bingo offenses, not commercial operations that may be defined as illegal gambling businesses under federal law. The State's argument ignores the language and reasoning of Bradenton II.
In Bradenton II, the Florida Supreme Court explicitly held "that under the present statutory scheme violations of the Bingo Statute are not punishable under the lottery or RICO statutes." 727 So.2d at 202. The supreme court did so after considering all bingo violations that the State raised at the 2005 trial. See id. at 200 (quoting nine violations of the Bingo Statute, including that persons conducting bingo games were not bona fide members *410 of charities and that bingo game proceeds were not returned to players in the form of prizes). Bradenton II discussed at length section 849.0931, the Bingo Statute. Id. at 201-02. The Florida Supreme Court explicitly disagreed with the State's argument that the defendants were unauthorized organizations whose violations of the Bingo Statute constituted illegal lotteries subject to punishment and forfeiture under the lottery and RICO statutes. Id. at 201. It noted that the lottery statute expressly does not apply to bingo. Id. at 202 (quoting § 849.09(3), Fla. Stat. (1993)). Furthermore, the RICO statute listed the provisions of the gambling chapter that it punished and did not include the Bingo Statute. Id. (citing § 895.02(1)(a)(32), Fla. Stat. (1995)). The Florida Supreme Court closed its discussion of the relationship between the Bingo Statute and the RICO statutes:
Without a clearer signal from the legislature, we are unwilling to create such a distinction and transform routine bingo offenses into lottery and RICO violations. Accordingly, we answer the certified question in the negative and hold that under the present statutory scheme violations of the bingo statute are not punishable under the lottery or RICO statutes.
Id.
Importantly, the "statutory scheme" already included section 895.02(1)(b), Florida Statutes (1995), by which the State attempted to use federal law to render the defendants' bingo violations subject to Florida RICO. In light of the subsection's existence when the Florida Supreme Court held that the "present statutory scheme" did not provide for RICO liability for bingo, the State's attempt to create RICO liability for bingo violations through section 895.02(1)(b) is directly contrary to the supreme court's decision and reasoning in Bradenton II.[5]
C. Defendants' damages
The defendants argue that they are entitled to damages for the State's wrongful injunction entered in 1995. The State responds that they are not entitled to damages because no bond was entered, the injunction was not wrongful, and it is illegal to profit from bingo. The defendants are correct.
The State argues that the defendants were not entitled to relief because, under section 60.07, a defendant may only recover damages under an injunction bond. Because there was no injunction bond entered here, then, the defendants could receive nothing. The State's argument overlooks both the Florida Supreme Court's award of costs and fees to the defendants after Bradenton II, which were premised on section 60.07, and contrary precedent. The Florida Supreme Court discussed this issue in Provident Management Corp. v. City of Treasure Island, 718 So.2d 738 (Fla.1998). There, the court restated the rule that damages under section 60.07 were limited to the amount of the bond. Provident, 718 So.2d at 739. However, this rule did not apply if the government had secured an unbonded injunction:
[W]here a court "dispenses with a bond" pursuant to the provisions of rule *411 1.610(b), the enjoined party is entitled to seek the full measure of the damages it sustained by reason of the wrongfully issued preliminary injunction.
* * *
To say that damaged parties are automatically barred from redress whenever a city posts no bond would impede the injunction process for governmental bodies, for if no citizen could obtain redress without a bond, courts would be reluctant to issue unbonded injunctions. This would thwart a purpose of rule 1.610(b), which is to make it easier, not harder, for governments to enforce their policies via injunctions.
Id. at 739-40.
The State's second argument was that the injunction was never adjudicated wrongful. Parties may still recover for the damages stemming from a wrongful injunction though the injunction is obtained in good faith. See, e.g., Parker Tampa Two, Inc. v. Somerset Dev. Corp., 544 So.2d 1018, 1021 (Fla.1989). In addition, the State's description of the injunction's dissolution as purely procedural is incorrect. This assertion might be accurate if the State allowed the injunction to lapse after the court's 1996 order requiring the State to post bond. On the contrary, the State's appeal and filing of an emergency writ in this court prevented the trial court from dissolving the injunction based on the failure to post bond until 1999. See Bradenton I, 701 So.2d at 1172-73. In the unique circumstances here  where this court and the supreme court highlighted the injunction's very broad nature and the severe harm to the defendants, and where the Florida Supreme Court explicitly awarded fees to the defendants based on section 60.07  "the dissolution of [the] temporary injunction [was] tantamount to a determination that the injunction was wrongfully issued [and] entitle[d] the defendant to recover for damages resulting from its issuance." Picasso Tower, Inc. v. Dairene Int'l, 874 So.2d 640, 642 (Fla. 3d DCA 2004) (quoting Roger Dean Chevrolet, Inc. v. Painters, Decorators & Paperhangers of Am., 155 So.2d 422, 425 (Fla. 2d DCA 1963)).
Finally, the State's argument that the defendants may not recover for the injunction because they were legally precluded from profits relating to bingo cannot be squared with the Florida Supreme Court's previous award of costs and fees to the defendants after Bradenton II and its quotation with approval of this court's observation that the "very broad injunction the [S]tate requested  and received  will severely damage the defendants if its entry was improper." Bradenton II, 727 So.2d at 202 (quoting Bradenton I, 701 So.2d at 1180).
The defendants' bingo offenses could not form the basis for RICO liability and forfeiture. Bradenton II and collateral estoppel barred the action below. We are intrigued by the State's zealousness in this prosecution in light of the Florida Supreme Court's ruling in Bradenton II and Pondella Hall for Hire, Inc. v. City of St. Cloud, 837 So.2d 510, 510-11 (Fla. 5th DCA 2003). During oral argument, the State contended that minor changes in the amended complaint, additional parties and reliance on a federal statute supported the revised prosecution. The argument is specious. The American Bar Association Standards for Criminal Justice, Prosecution Function Standard 3-1.1(b) and 3-1.1(c) (2nd ed. 1986 Supp.) states:
(b) The prosecutor is both an administrator of justice and an advocate. The prosecutor must exercise sound discretion in the performance of his or her functions.

*412 (c) The duty of the prosecutor is to seek justice, not merely to convict.
We recommend this section to the prosecutors for their edification and enlightenment. Therefore, we REVERSE and REMAND for further proceedings in accordance with this opinion.
PALMER, C.J., concurs.
TORPY, J., concurs in result only, without opinion.
NOTES
[1] Furtney was the president of the three companies. Pondella received income from rentals to charities and from sale of bingo paper. Eight Hundred received income from canteen sales in the halls  crane machines, cigarette sales, candy sales, etc. Bradenton owned two of the properties and received income from renting them to Pondella.
[2] In a related case, we included language, which reflected our belief that the Florida Supreme Court's decision had eliminated the State's forfeiture claim: "[A] RICO action filed by the Attorney General ultimately was invalidated by the Florida Supreme Court. See [Bradenton II]." Pondella Hall for Hire, Inc. v. City of St. Cloud, 837 So.2d 510, 510-11 (Fla. 5th DCA 2003).
[3] The Lamar amended complaint sought, among other things, forfeiture under Florida's RICO statute. The charges were based on Furtney and Pondella's operation of a public gambling house and its operation of illegal lotteries based on its 1993 bingo violations in Orange and Osceola Counties. The RICO enterprise was the commercial bingo operation operating from August 1993 to April 1994. In the case below, two of the predicate acts considered by the jury concerned the same Orange and Osceola Counties' bingo halls during the same timeframes at issue in Lamar.
[4] The State occasionally discussed other games that allegedly were not bingo, but the unrefuted testimony established those games used bingo cards supplied by a bingo supplier and were played with bingo balls pulled from a bingo blower. Likewise, the issue of promotional giveaways was insubstantial.
[5] The State argues in a footnote that Bradenton II also does not apply because the State alleged that the defendants violated the lottery statute. There were two grounds for the lottery violations: that various games were not bingo games, and that the promotional giveaways constituted illegal lotteries. The evidence at trial undermined both arguments. Uncontroverted testimony refuted these allegations. More importantly, the State, at trial and during oral argument on appeal, emphasized that the primary issue was the defendant's bingo violations, which purportedly constituted racketeering activity.